Larry STACK and Ari Parnes, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

Keith R. LOBO, et al., Defendants.

Civ. No. 95–20049 SW.

United States District Court, N.D. California.

Sept. 15, 1995.

Milberg Weiss Bershad Hynes & Lerach, William Lerach, Travis E. Downs, III, San Diego, CA, for plaintiffs.

Morrison & Foerster, Paul Friedman, Carolyn Johnston, San Francisco, CA, for defendants.

## ORDER GRANTING IN PART AND DENYING IN PART THE QUICKTURN DEFENDANTS' MOTION TO DISMISS; GRANTING THE UNDERWRITERS' MOTION TO DISMISS

SPENCER WILLIAMS, District Judge.

In this securities fraud class action, Plaintiffs allege that Quickturn Design Systems, Inc. and its officers and directors ("the Quickturn Defendants"), in concert with Morgan Stanley, Hambrecht & Quist and two of their analysts ("the Underwriters"), defrauded investors in violation of § 11 and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77k & 77l, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. In its Order of April 20, 1995 ("Dismissal Order"), the Court dismissed Plaintiffs' First Amended Complaint ("FAC") in its entirety with leave to amend. After Plaintiffs amended, both the Quickturn Defendants and the Underwriters moved to dismiss Plaintiffs' Second Amended Complaint ("SAC") pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b). Based on the following, the Quickturn Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART, and the Underwriters' motion to dismiss is GRANTED.

## BACKGROUND

Quickturn is a high-technology company located in Mountain View, California that designs and manufactures verification solutions for the design of integrated circuits and electronic systems. Quickturn's systems allow design engineers to create reprogrammable prototypes used in the fabrication of silicon chips. The Corporate Defendants are officers, directors, and outside directors of Quickturn. Plaintiffs are a group of individual investors who bought Quickturn common stock between December 15, 1993 and January 5, 1995 (the "Class Period").

The facts leading to this lawsuit are as follows. On December 15, 1993, Quickturn completed an initial public offering ("IPO") in which the company issued 3.4 million shares of common stock at $12 per share. Morgan Stanley and Hambrecht & Quist served as lead underwriters of the Quickturn IPO.

During early and mid–1994, Quickturn's stock price fluctuated in a volatile manner, from a high of $16½ in mid-April to a low of $5¼ in mid-July. At the end of 1994, the stock price was slightly more than $13 per share.

Then, on January 5, 1995, Quickturn announced that it had taken a $3.7 million writeoff during the fourth quarter of 1994. In response, the stock price fell more than 50 percent to $7¼ per share.

Plaintiffs filed suit approximately two weeks later, on January 20, 1995, alleging that during the Class Period the Corporate Defendants and the Underwriters participated in a scheme to defraud the investing public by deceiving them about various aspects of Quickturn's current and future financial performance. According to Plaintiffs, Defendants became so desperate to keep pace with their earnings projections that they: 1) committed accounting fraud by making sales to less proven customers, by prematurely and improperly recognizing revenue, and by understating financial reserves for doubtful accounts; 2) issued false and misleading statements about Quickturn's finan-

cial situation, projected earnings, and business prospects, and; 3) adopted false and misleading statements made by securities analysts.

## LEGAL STANDARD

Under the liberal federal pleading policies, a plaintiff need only give defendant fair notice of the claims against it. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). A claim should not be dismissed unless it is certain that the law would not permit the requested relief even if all of the allegations in the complaint were proven true. *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987), *cert. denied,* 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987). Therefore, for purposes of this motion to dismiss, the Court assumes the truth of all factual allegations in the complaint as well as all reasonable inferences drawn from them.

In complaints alleging fraud, however, the heightened pleading standards of Fed.R.Civ.P. 9(b) apply. This rule requires averments of fraud or inequitable conduct to be "stated with particularity." Fed.R.Civ.P. 9(b). Rule 9(b) does not necessitate pleading of detailed evidentiary matter. Nonetheless, mere conclusory allegations of fraud are insufficient. *Moore v. Kayport Package Express,* 885 F.2d 531, 540 (9th Cir.1989). The plaintiff must include statements regarding the time place and nature of the alleged fraudulent activities, and must specifically identify what was misrepresented or concealed so as to give the opposing party notice of the particular conduct which is alleged to constitute the fraud. *Id.* Merely making general conclusory allegations of fraud, and then reciting a list of neutral facts, is not sufficient. *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985).

The Ninth Circuit recently clarified the scope of Rule 9(b) pleading requirements as applied to securities fraud actions in *In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541 (9th Cir.1994) (en banc). According to the *GlenFed* court, a plaintiff does not state a claim for securities fraud merely by asserting that a company's revelation of bad news means that "earlier, cheerier" statements must have been false. *Id.* at 1548. Rather, the plaintiff must plead the specific circumstances of the alleged fraud, including the time, place, and nature of the statements made, and also facts demonstrating how the statements were false or misleading. *Id.* The *GlenFed* court further suggested that the most direct way to prove that representations were false when made is to point to inconsistent contemporaneous statements or omissions which contradict the challenged statements. *Id.* at 1549.

## DISCUSSION

I. *THE CORPORATE DEFENDANTS' MOTION TO DISMISS*

A. *§ 10(b) Claims*

Plaintiffs have filed their SAC in an attempt to state their allegations of fraud with particularity. After reviewing the changes Plaintiffs have made, the Court finds that the only claims that are sufficiently pled are those relating to Quickturn's $3.7 million writeoff during the fourth quarter of 1994 for sales to Acri and Ball. All of Plaintiffs' other allegations of fraud are still too vague and conclusory to pass muster.

### 1. *The Law*

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, makes it unlawful to use in connection with "the mails or facilities of interstate commerce" any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe...." Rule 10b–5 promulgated under section 10(b) provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1993).

■ The elements of a § 10(b) claim are: 1) a false statement or an omission that rendered another statement misleading; 2) materiality; 3) scienter; 4) loss causation; and 5) damages. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

### 2. *Plaintiffs' Claims*

In the SAC, Plaintiffs identify numerous types of fraud allegedly committed by Defendants. For ease of analysis, the Court will divide these allegations into four general categories and examine each in turn: 1) accounting fraud; 2) the company's own statements; 3) analysts' reports and; 4) the "scheme" to defraud.

#### a. *Accounting Fraud Allegations*

In the SAC, Plaintiffs assert the same four types of accounting fraud as in the FAC.

##### i. *The $3.7 Million Writeoff*

Plaintiffs allege that Quickturn improperly recognized $3.7 million in revenue for two sales during the second quarter of 1994, and then was forced to write these sales off during the fourth quarter of 1994 when these customers could not pay their bills. In the Dismissal Order, the Court found these allegations to be deficient because they did not name the customers to whom the sales were made or explain why it was unlikely that those customers would be able to pay for their purchases.

In their SAC, Plaintiffs have responded by naming the two customers, Acri and Ball, and by providing explanations of the financial problems the two companies were having when Quickturn made the sales to them. Specifically, Plaintiffs allege that in early 1994 Quickturn became aware that Acri was a "marginal company." SAC, ¶ 12(b). Consequently, Quickturn refused to extend Acri

customer credit, instead requiring cash payments. Plaintiffs further allege that Quickturn knew Acri's main sponsor, the French government, was "about to pull Acri's funding." SAC, ¶ 12(b). With respect to Ball, Plaintiffs allege that Quickturn was aware that Ball had taken a $65.1 million loss in 1993, and that Ball's aerospace business had continued to flounder during 1994. SAC ¶ 12(c). Plaintiffs contend that these allegations contain adequate particularity.

Defendants respond that Plaintiffs still have not identified any specific contemporaneous statements or documents known to Quickturn in early 1994 that should have alerted the company to Acri's and Ball's precarious financial situations. With respect to Ball, Defendants also submit a 1993 10–K purportedly demonstrating that nothing in Ball's financial situation should have put Quickturn on notice that Ball would not be able to pay its bills.

■ The Court agrees with Plaintiffs, and finds that their allegations are sufficiently particularized to withstand Rule 9(b) scrutiny. Plaintiffs have identified the customers in question and have provided facts which were or should have been known to Quickturn regarding these customers' financial situations. Taking Defendants approach, and requiring Plaintiffs to identify specific documents within Defendants possession that should have alerted them to Acri's and Ball's financial difficulties, would run afoul of Rule 9(b)'s proviso that Plaintiffs need not plead detailed evidentiary facts that are in the sole possession and control of the Defendants. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir.1987).

##### ii. *Adequacy of Reserve for Doubtful Accounts*

■ Plaintiffs also allege that Quickturn violated accounting principles by failing to allow adequate reserves for doubtful accounts receivables in its March 31, 1994, June 30, 1994, and September 30, 1994 financial statements. In the Dismissal Order, the Court found these allegations to be inadequate because they did not name any "less creditworthy" customers or explain why any such customers would have been unlikely to

pay their bills. Instead, Plaintiffs relied solely on statistics regarding sales and accounts receivable that could have been indicative of numerous factors other than fraud.

The only material change to these allegations that Plaintiffs make in their SAC is to use Acri and Ball as examples of "less creditworthy" customers. Plaintiffs have not pled any facts to support their claim that Quickturn failed to allow adequate reserves for sales to any other customers. Therefore, Plaintiffs' allegations about the reserve for doubtful accounts are dismissed except as it they relate particularly to Acri and Ball.

### iii. *Restructuring Reserve*

Plaintiffs further claim that Quickturn overstated the $9.4 million "restructuring charge" recorded as part of the PiE merger in June of 1993. In the Dismissal Order, the Court found that Plaintiffs had failed to allege any facts whatsoever that demonstrated how any restructuring charges were improper. In their SAC, Plaintiffs have now added the following sentence: "The portion of the restructuring charge that was excessive and intended to create the 'cushion' was included in the $4,266,00 portion of the reserve recorded for 'duplicate resources.'"

■ Plaintiffs' addition does not change the Court's view that these allegations fail under Rule 9(b). Plaintiffs still do not explain how or why any particular restructuring charges were excessive. Plaintiffs appear to be simply guessing that the restructuring charge was overstated. Pure speculation such as this does not enable Plaintiffs to survive a motion to dismiss and entitle them to conduct discovery on their claims. *See Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir.1994) (one of the purposes of Rule 9(b)'s particularity requirement is to prevent plaintiffs from filing baseless claims merely to discover unknown wrongs).

### iv. *Premature Recognition of Revenue*

Lastly, Plaintiffs allege that Quickturn violated accounting principles by recording revenue when it signed contracts for sales of its products, instead of at the time of actual shipment. In the Dismissal Order, the Court found these allegations to be insufficiently specific because they did not name any particular instances of premature recognition, and because a statistical increase in a company's ratio of receivables to revenue, without more, does not warrant an inference of fraud.

The Court's analysis here is similar to that of section I.A.2.a.ii above. Again, the only material changes Plaintiffs have made to their allegations is to name Acri and Ball as examples of sales where Quickturn prematurely recognized revenue. Therefore, Plaintiffs' allegations are only sufficiently particularized with respect to those two companies, and the allegations are dismissed as they relate to all other customers.

### b. *The Company's Own Statements*

Plaintiffs also reassert their claims that statements made by the Corporate Defendants in numerous press releases, conference calls, and the pre-offering "Roadshow" were false and misleading.

### i. *Statements About Demand for, Sales of, and Market Reaction to Quickturn's Products*

Plaintiffs make numerous allegations regarding Quickturn's statements about demand for, sales of, and market reaction to Quickturn's products. In the Dismissal Order, the Court found that Plaintiffs had not supported any of these allegations with contemporaneous facts demonstrating that Quickturn's statements were false, or lacked a reasonable basis, when made.

In the SAC, Plaintiffs have added three new material allegations regarding Quickturn's products: 1) that Quickturn was having technical de-bugging problems in completing the final development and production of the System Realizer models M–250 and M–300; 2) that because of these problems these two models were delayed in reaching the market and; 3) that this delay caused Quickturn to lose significant sales of the M–250 in the second and third quarters of 1994 and of the M–300 in the third and fourth quarters of 1994. SAC, ¶ 114(a). According to Plaintiffs, these allegations belie Defendants' statements in December 1993 that they intended to introduce these new products during 1994. *See* SAC, ¶ 57, 91.

■ The Court finds these allegations to be insufficient as well. Plaintiffs do not allege any facts showing that Defendants knew, or even suspected, that the products would be delayed in reaching the market when they made their statements in December of 1993. Furthermore, Plaintiffs have not even alleged that Defendants' statements were literally false. In their public statements, Defendants merely stated that their products would be introduced during 1994. The products were actually introduced in October and December of 1994.

■ Plaintiffs have also attempted to bolster their claim that Defendants lacked a reasonable basis for representing that large sales not closed in the second quarter would, with one or two exceptions, be closed in the last two quarters of 1994. To do so, Plaintiffs name Sun Microsystems as one of the customers to whom a sale failed to close. SAC, ¶¶ 10, 13(i), 74, 101(b). The mere naming of Sun, however, does nothing to explain how or why Defendants should have known, at the time of their public statements, that their sale to Sun, or anyone else, would not close. Therefore, these allegations are not adequate either.

### ii. Comparisons of Actual Results to Internal Expectations

Plaintiffs next allege that Defendants made false statements about Quickturn's performance as compared to internal forecasts. In the Dismissal Order, the Court rejected these allegations because they failed to cite the dates or preparers of any internal forecasts or to specify the manner in which any forecasts differed from the information divulged in Quickturn's public statements.

In the SAC, Plaintiffs have now added a lengthy paragraph describing in extremely general terms the manner in which Quickturn prepares an annual internal "business plan, budget, forecast and/or projection." SAC, ¶ 37(a). Plaintiffs allege that one such forecast was finalized in the fourth quarter of 1993 and was presented to the full Board for approval in "late 1993 or early 1994." SAC, ¶ 37(b). According to Plaintiffs, Quickturn's actual performance, reviewed on a monthly basis, was "lower than the levels forecasted or budgeted, as was its net income and earnings per share." SAC, ¶ 37b).

■ Plaintiffs' amended allegations are pure form and no substance. The general language of ¶ 37 in the SAC is slightly more detailed, but just as conclusory as the allegations that the Court has already dismissed. Plaintiffs still fail to refer to any particular forecasts and explain how they differed from Quickturn's actual results. Merely asserting that the actual results were "lower" than the forecasts is not enough. *See In re Syntex Corp. Securities Litigation,* 855 F.Supp. 1086, 1097 (N.D.Cal.1994) ("[v]ague, canned or form allegations are no substitute for the particularity required by Fed.R.Civ.P. 9(b)").

### iii. Comments About the Industry

Plaintiffs also claim that Quickturn's officers made misrepresentations by commenting favorably on the state of the "large and growing" market for emulation systems. In the Dismissal Order, the Court found that Plaintiffs had not provided facts explaining how these statements were false. In their SAC, Plaintiffs have now added a paragraph stating: "the market for emulation products like Quickturn's was neither large nor growing ... [and] Quickturn had no studies or objective bases to support such representations which they knew were false." SAC, ¶ 75(j).

■ Plaintiffs' allegations are plagued with at least two problems. First, Plaintiffs allege no facts in support of their conclusory assertion that the market for emulation systems was not large or growing. Second, Defendants' statements about the "large and growing" market are too vague and amorphous to be actionable because no reasonable investor could be expected to rely on them. *See, e.g., Raab v. General Physics Corp.,* 4 F.3d 286, 289 (4th Cir.1993) (finding statements such as "[defendant] is poised to carry the growth and success of 1991 well into the future," that the market for defendant's services had "an expected annual growth rate of 10% to 30% over the next several years," and that "results during the remainder of 1992 should be in line with analysts' current projections" not to be actionable).

#### iv. *Descriptions of the Sales Force*

In addition, Plaintiffs allege that Quickturn falsely characterized its sales force as "highly skilled." In the Dismissal Order, the Court found that Plaintiffs had failed to specify the types of problems involved, state the qualifications that were lacking, or make any comparisons with the sales forces of similar companies. Instead, Plaintiffs relied on purely conclusory allegations of inexperience and hindsight explanations by Quickturn.

Plaintiffs have now elaborated on their sales force allegations as follows:

> Quickturn did not have a highly skilled sales force as, in fact, its sales force consisted of a significant number of sales persons who had little or no experience selling emulation systems such as those designed and sold by Quickturn, which involved a highly "conceptual" sales and an extended sales cycle that could range from between several months to several years, and therefore, Quickturn's sales force lacked the acumen or maturity of more seasoned sales forces and, as a result, could not properly manage the sales process, *i.e.* forecast with any reasonable degree of certainty when and in which quarter or fiscal year particular sales would close

SAC, ¶ 75(b); *see also,* ¶¶ 13(a), 101(a).

■ This new language, while more verbose, still fails to allege any facts whatsoever showing that Quickturn's statements about its sales force were false when made. Plaintiffs' entire argument on this issue is based upon the same hindsight explanations for poor sales performance made by Defendants long after the period in question.

Furthermore, characterizing a sales force as "highly skilled" is too vague a statement to be actionable under the securities laws. *In re Caere Corporate Securities Litigation,* 837 F.Supp. 1054, 1057–58 (N.D.Cal.1993); *Rogal v. Costello,* Fed.Sec.L.Rep. (CCH) ¶ 97,245 at 95,093–94, 1992 WL 426467 (N.D.Cal.1992). Plaintiffs' reliance on *Kaplan v. Rose,* 49 F.3d 1363 (9th Cir.1994), for the proposition that an optimistic statement such as this can be actionable is misplaced. In *Kaplan,* the Ninth Circuit specifically stated that because the district court had not fully examined the issue of the materiality of many of the defendants' statements below, the court would not do so on appeal. The only statements in *Kaplan* that the Ninth Circuit found to be material were far more specific than those at issue here. *See id.* at 1371–74.

#### v. *Predictions of the Future*

Lastly, Plaintiffs assert that on six occasions Quickturn's officers falsely represented that Quickturn's earnings would increase and that profitable growth would continue into the future. In the Dismissal Order, the Court determined that Plaintiffs had failed to allege sufficient facts showing that Defendants' statements lacked a reasonable basis when made.

Now, since the Court has found that Plaintiffs' SAC pleads with particularity the claims concerning the writeoff of sales to Acri and Ball, Plaintiffs have alleged facts which might undermine Defendants' predictions of the future. Therefore, Plaintiffs' allegations are adequate solely as they pertain to the $3.7 million writeoff of sales to Acri and Ball. The Court does not, however, address the materiality of any of Quickturn's predictions of the future at this time.

#### c. *Analysts' Statements*

Plaintiffs also claim that certain Quickturn insiders used securities analysts as "conduits" through which they disseminated false information to the market. In the Dismissal Order, the Court rejected all of Plaintiffs' claims based on analysts reports because: 1) Plaintiffs failed to sufficiently allege that Defendants adopted the analysts' projections as their own and; 2) Plaintiffs failed to show that there was no reasonable basis for the analysts' statements when they were made.

■ The general rule is that a company may be liable for analysts' forecasts which it fostered and reviewed but failed to correct, if it expressly or impliedly represented that the information in the forecasts was accurate or coincided with the company's views. *Syntex,* 855 F.Supp. at 1097. For liability to attach, the plaintiff must demonstrate: 1) that a corporate insider adopted the analysts' forecasts, *see Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 163 (2d Cir.1980), and; 2) that

the insider knew the analysts' forecasts were unreasonable when made yet failed to disclose their unreasonableness to investors. *See Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 516 (7th Cir.1989); *In re Veri-Fone Securities Litigation,* 784 F.Supp. 1471, 1486–87 (N.D.Cal.1992), *aff'd,* 11 F.3d 865 (9th Cir.1993).

#### i. *Adoption*

■ To plead adoption of analysts' statements with a sufficient degree of specificity to satisfy Rule 9(b), a plaintiff must: 1) identify specific analysts' forecasts and name the insider who adopted them; 2) point to specific interactions between the insider and the analyst which gave rise to entanglement, and; 3) state when these interactions occurred. *Syntex,* 855 F.Supp. at 1097; *Caere,* 837 F.Supp. at 1059. Furthermore, entanglement requires a two-way flow of information. *Syntex,* 855 F.Supp. at 1097. The plaintiff must allege that the insider provided misleading information to an analyst, that the analyst relied on this information in preparing a report, and that the insider somehow endorsed or approved the report prior to or after its publication. *See id.* (dismissing claims based on analysts' reports because there were "no factual allegations that [the insider] entangled himself with the report prior to or after its publication ... by endorsing or approving the spin its authors put on the information he had disclosed or by attesting to the accuracy of its forecasts or conclusions").

To clarify its analysis of Plaintiffs' allegations of entanglement, the Court will divide the analysts' reports into three categories: 1) the internal advisories; 2) the published reports and; 3) the reports contained in the investor relations package.

#### 1. *Internal Advisories*

Plaintiff's entanglement allegations in the FAC were limited to general introductory paragraphs alleging that a group of three Quickturn insiders communicated regularly with securities analysts and customarily reviewed and approved drafts of analysts' reports. The Court found these allegations to be insufficient because they did not point to specific interactions between specific Quick-

turn insiders and specific analysts that led to the publication of specific reports.

■ In their SAC, Plaintiffs have refined their conclusory introductory allegations of entanglement by adding meaningless details about Defendants' contacts with analysts. *See* SAC, ¶¶ 41–44. None of these allegations are sufficient to plead the time, place and nature of the alleged entanglement. Therefore, with respect to the internal advisories quoted at ¶¶ 70, 71, 73, 77, 78, 79, 81, 83, 84, 85, 87, 88, 89, 92, 93, 94, 96, 98 of the SAC, Plaintiffs' allege no more specific allegations than they did in the FAC. Consequently, Plaintiffs have failed to plead entanglement with particularity for any of the internal advisories.

#### 2. *Published Reports*

Plaintiffs' SAC does, however, elaborate on its entanglement allegations for the eight published analysts' reports that are quoted at ¶¶ 62, 64, 69, 72, 80, 82, 86 and 95 of the SAC. Plaintiffs allege that the analyst who wrote each of these reports sent copies to three Quickturn insiders (Lobo, D'Amour and Ostby), and that all three of these insiders reviewed and approved of the report during the week prior to the report's publication. *See* SAC ¶¶ 62(d), 64(c), 69(b), 72(b), 80(b), 82(b), 86(b), 95(b).

Defendants argue that these allegations still do not meet the stringent pleading standards of *Syntex* and *Caere* because Plaintiffs do not specify which of the three named insiders actually reviewed and approved of the reports and what actual information and feedback the insiders provided to the analysts. Defendants also direct the Court's attention to *Fisher v. Acuson,* 1995 WL 261439 (N.D.Cal. Apr. 26, 1995), and argue that similar allegations were dismissed for lack of particularity in that case. In *Acuson* the plaintiffs alleged entanglement in nineteen different paragraphs as follows: "The Acuson insiders who provided [information in the analyst] reports to the author were Abbott, Maslak and Gallagher. The author provided a copy of this report to Acuson immediately upon its issuance which confirmed no disagreement with it."

Plaintiffs respond by citing two cases from this district that found allegations of entanglement less specific than those here to be sufficient. *In re Valence Technology, Inc. Sec. Litig.,* [Current Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,793 at 92,793–94, 1995 WL 274343 (N.D.Cal.1995); *In re Gupta Corp. Sec. Litig.,* [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,612 at 91,782, 1994 WL 748988 (N.D.Cal.1994). Plaintiffs also assert that they cannot be required to plead detailed evidentiary facts that are in the sole possession and control of Defendants.

The parties' divergent views on this issue reflect the tension that exists within the pleading requirements of Rule 9(b). On the one hand, plaintiffs should not be allowed to proceed to discovery, and to burden defendants with substantial litigation costs, based on vague and purely conclusory allegations of fraud. On the other hand, investors with meritorious claims should not be barred from obtaining relief merely because they do not have access to specific evidentiary facts that are controlled and closely guarded by corporate insiders. The Court believes that the three-part test of *Caere* and *Syntex,* applied fairly, strikes a balance between these two competing concerns by requiring the pleading of the time, place and nature of entanglement, but not requiring overly detailed allegations about how and what specific information was conveyed to the analyst.

■■■ Applying the three-part test here, the Court finds that Plaintiffs have pled entanglement with particularity. Plaintiffs have included allegations that: 1) name a group of three Quickturn insiders and specify particular analysts reports and the analysts responsible for drafting them; 2) state that all three insiders reviewed and approved each of these analyst reports and; 3) assert that these interactions occurred during the week prior to the report's publication. These allegations are more specific than those dismissed in *Acuson* because Plaintiffs have stated the dates on which the interactions took place, and have represented that the three named insiders all placed their imprimaturs on the reports.

Taken as true, Plaintiffs' allegations regarding the eight published reports quoted at ¶¶ 62, 64, 69, 72, 80, 82, 86, and 95 of the SAC satisfy Rule 9(b). Of course, if, after discovery, the Court concludes that Plaintiffs' allegations of entanglement lack a reasonable factual basis, Plaintiffs will be subject to Rule 11 sanctions.

### 3. *Investor Relations Package*

In the Dismissal Order, the Court noted that the only analysts' reports that even came close to satisfying the entanglement requirement were those seven that Quickturn allegedly copied and circulated as part of their "investor relations package." The Court reasoned that by reproducing and including these reports in their own stockholder informational materials, Quickturn may have impliedly represented that the information contained in those reports was accurate or reflected the company's own views. However, ultimately the Court dismissed these allegations because Plaintiffs did not identify the particular "investor relations package" or provide the date on which it was sent out.

In the SAC, Plaintiffs have supplemented their allegations about the investor relations package by providing some additional detail regarding its preparation and contents. Plaintiffs allege that the package "was put together by Quickturn's investor relations department and approved by Lobo and Ostby." SAC, ¶ 42(b). Although Plaintiffs state that it would be impracticable to name the exact dates on which the package was sent out or its precise contents, they do name the specific brochures and analysts reports contained in the package. SAC, ¶ 42(b). Plaintiffs assert that this is sufficient detail to establish entanglement with particularity.

Defendants respond by urging the Court to reconsider its earlier ruling concerning the investor relations package because it is inconsistent with the requirements of Rule 9(b). Defendants further argue that even under such a rule Plaintiffs' new allegations are still insufficiently specific because they do not allege the dates on which the package was sent out, the recipient, or the precise contents of the package.

■ The Court is persuaded that its earlier interpretation of the law was correct. Plaintiffs may state a claim of entanglement by alleging that Quickturn insiders sent out certain analysts reports as part of an investor relations package. *See In re RasterOps Corporation Sec. Litig.*, [1994–95 Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,467 at 91,195, 1994 WL 618970 (N.D.Cal.1994); *In re Cypress Semiconductor Securities Litigation*, 1995 WL 354855 (N.D.Cal. Jun. 6, 1995).

■ Furthermore, Plaintiffs here have pled sufficient facts with regard to the investor relations package to satisfy Rule 9(b). Plaintiffs allege that specific Quickturn insiders approved the inclusion of specific analysts' reports and brochures in the package. Requiring Plaintiffs to identify each package that was sent out and the date on which it was sent would be unduly burdensome and unrealistic.

Therefore, Plaintiffs have pled entanglement with particularity for those analysts' reports that were sent out in Quickturn's investor relations package. Notably, however, Plaintiffs allege that two overlapping sets of analysts' reports were sent out. In ¶ 42(a), they name reports quoted in ¶¶ 62, 63, 69, 72, 80, 82, 86, and 95 of the SAC, while in ¶ 42(b) they name those quoted in ¶¶ 62, 64, 70, 73, 81, 83, 87 and 96. The Court assumes that Plaintiffs made a typographical error in ¶ 42(a) because the reports quoted in ¶ 42(b) are the same ones named in the FAC, and because ¶ 63 contains a Quickturn press release, not an analyst report.

### ii. *Unreasonableness*

■ In the Dismissal Order, the Court also stated that even if Plaintiffs had satisfied the entanglement requirement, they still failed to demonstrate unreasonableness: that the analysts' forecasts lacked a reasonable basis when issued. As discussed previously, since Plaintiffs have pled facts relating to Quickturn's writeoff of the sales to Acri and Ball, they have satisfied the unreasonableness requirement with respect to any statements that would be undermined by the alleged improper recognition of revenue for those two sales. Notably, however, the Court does not address the materiality of any statements made in the analysts' reports at this time.

### d. *The "Scheme" to Defraud*

In its Dismissal Order, the Court dismissed Plaintiffs' scheme claims with prejudice because, pursuant to the Supreme Court's ruling in *Central Bank v. First Interstate Bank*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), several courts in this district have held that secondary liability claims based on allegations of "conspiracy" are not actionable under § 10(b). *Syntex*, 855 F.Supp. at 1097–98; *RasterOps*, Fed.Sec. L.Rep. (CCH) ¶ 98,467 at 91,195; *In re Ross Securities Litigation*, [1994–95 Binder] Fed. Sec.L.Rep. (CCH) ¶ 98,363 at 90,495, 1994 WL 583114 (N.D.Cal.1994). The Court found Plaintiffs' "scheme" allegations to be no more than a thinly disguised attempt to avoid the impact of the *Central Bank* decision. *See, e.g., Gupta*, Fed.Sec.L.Rep. (CCH) ¶ 98,612 at 91,783–84 (rejecting the plaintiffs' attempts to recharacterize non-actionable conspiracy claims as "scheme" claims, and dismissing such claims with prejudice).

■ In the SAC, Plaintiffs have realleged those same fraudulent scheme allegations. These allegations are insufficient for two reasons. First, as discussed above, they are identical to those already dismissed for failure to state a claim. Second, as discussed elsewhere in this Order, the only defendants remaining in this case are the Quickturn Defendants. There are no other defendants remaining with whom a scheme could have been concocted.

Therefore the scheme allegations are STRICKEN.

### B. *Section 11 and 12(2) Claims*

■ Plaintiffs also assert claims under § 11 and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77k and § 77*l*. Section 11 provides that any signer, officer of the issuer, or underwriter may be held liable for a registration statement that contains an untrue statement of a material fact or omits a material fact. 15 U.S.C. § 77k(a). Section 12(2) imposes liability on sellers of securities sold "by means of a prospectus or oral communi-

cation, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading...." 15 U.S.C. § 77*l*. Claims may be brought under §§ 11 and 12(2) by those who purchased securities in a public offering and by those whose securities are traceable to the public offering. *In re AES Corp. Sec. Lit.*, 825 F.Supp. 578, 592 (S.D.N.Y.1993).

### 1. § 12(2) Claims

Defendants argue that Plaintiffs lack standing to sue under § 12(2) because they purchased their shares of Quickturn stock in aftermarket trading, not as part of the IPO. Plaintiffs disagree, citing § 4(3)(B) of the Securities Act of 1933, 15 U.S.C. § 77d(3)(B), and noting that they purchased their shares within 90 days of the IPO.

 Defendants are correct. Section 12(2) applies only to initial public offerings, not secondary transactions. *Gustafson v. Alloyd Co., Inc.*, —— U.S. ——, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The SAC alleges only that Plaintiffs purchased shares that were issued pursuant to Quickturn's December 1993 Registration Statement and Prospectus. SAC, ¶¶ 2 n. 1, 20(a). The SAC contains no allegations that Plaintiffs purchased their shares in the IPO. Nor have Plaintiffs alleged any facts giving rise to an inference that their shares can be traced to the IPO. Therefore, Plaintiffs do not state a claim under § 12(2).

 Plaintiffs' reliance on § 4(3)(B) is unavailing. Section 4(3)(B) requires dealers to provide a prospectus in conjunction with aftermarket sales of a newly issued stock for varying periods of time after the IPO. If the stock is listed on an electronic interdealer quotation system, as Quickturn's is, *see* SAC ¶ 24, the prospectus must be provided only for sales occurring within 25 days of the IPO. Rule 174(d), 17 C.F.R. § 230.174(d). Two courts have held that § 4(3)(B) extends the period of an initial public offering and those who purchase shares during that period have a cause of action under § 12(2). *See Wade v. Industrial Funding Corp.*, [1993–94 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,144 at

99,024, 1993 WL 650837 (N.D.Cal.1993); *In re Proxima Corp. Sec. Lit.*, [1993–94 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,236 at 99,622, 1994 WL 374306 (S.D.Cal.1994). Parnes purchased his shares on February 1, 1994, 48 days after the December 15, 1993 IPO. SAC, ¶ 20(b). Stack purchased his shares on October 12, 1994. SAC, ¶ 20(a). Thus, Plaintiffs' purchases occurred outside the 25-day window created by Rule 174(d).

### 2. § 11 Claims

Defendants also contend that *Gustafson* forecloses Plaintiffs' claim under § 11. In response, Plaintiffs argue that Defendants' reading of *Gustafson* is too broad.

In *Gustafson*, the Supreme Court held that § 12(2) applies only to initial distributions of securities in public offerings. To reach this result, the Court turned first to definitional provisions in the 1933 Act. The majority concluded that when read in conjunction with these provisions, § 12(2) imposes prospectus liability only when the issuer is required to distribute a prospectus. *Id.* at 1067. Because the Act imposes no such duty for secondary private transactions, those transactions are outside the scope of § 12(2). *Id.* The majority also noted that its interpretation was consistent with the legislative history of the 1933 Act. *Id.* at 1072. In this regard, the Court quoted a House Report indicating that the bill was intended to affect only new offerings of securities, not the ordinary redistribution of securities. *Id.* (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess., 5 (1933).

 Although *Gustafson* only addresses the applicability of § 12(2) to secondary transactions, it applies with equal force to § 11. For one, the two sections share the same legislative history. Indeed, the House Report quoted by the Supreme Court suggests that liability under sections 11 and 12 arises only for transactions requiring a registration statement. *Id.* Several cases predating *Gustafson* share the view that § 11 applies only to initial distributions. *See Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 691 (3rd Cir.1991), *cert. denied*, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991);

*In re Delmarva Sec. Lit.,* 794 F.Supp. 1293, 1309 (D.Del.1992); *Mullaly v. Wiles,* 1991 WL 504866, *3 (D.Colo. Oct. 24 1991); *Franklin Life Ins. Co. v. Commonwealth Edison Co.,* 451 F.Supp. 602, 607 n. 1 (S.D.Ill.1978), *aff'd,* 598 F.2d 1109 (7th Cir. 1979), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979). The dissenters in *Gustafson* appear to agree. *See Gustafson,* —— U.S. at —— – —— n. 4, 115 S.Ct. at 1081–82 n. 4 ("There is no dispute that [sections 11 and 12(1) ] apply only to public offerings—or, to be precise, to transactions subject to registration.") (Ginsburg, J., dissenting). Accordingly, this Court concludes that § 11 is not applicable to aftermarket transactions.

The SAC contains no allegations that Plaintiffs purchased their shares in Quickturn's IPO or that the shares they purchased can be traced to the IPO. Therefore, Plaintiffs lack standing to assert a claim under § 11.

### C. *The Outside Directors*

The outside directors named in the SAC, Glen M. Antle, Frank J. Caufield and William J. Harding, move to dismiss Plaintiffs' claims against them by arguing that the SAC fails to allege that any of them made a false or misleading statement. In response, Plaintiffs contend that Antle, Caufield and Harding signed various documents which are alleged to be misleading.

■ Rule 9(b) requires a plaintiff to attribute fraudulent acts or statements to a particular defendant. However, under the group pleading doctrine, allegations of securities fraud based on false or misleading statements in "prospectuses, registration statements, annual reports, press releases or other 'group-published information,'" are presumed to be the collective actions of officers and directors are directly involved in the day-to-day affairs, management or control of the company. *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987); *XOMA Corp. Sec. Lit.,* [1991–92 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,491 at 92,160, 1990 WL 357807 (N.D.Cal.1991); *Smith v. Network Equip. Tech., Inc.,* [1990–91 Transfer Binder] Fed.Sec.L.Rep. (CCH)

¶ 95,659 at 98,093, 1990 WL 263846 (N.D.Cal. 1990). A plaintiff relying on the group pleading doctrine satisfies Rule 9(b)'s particularity requirement by pleading the alleged misrepresentations with particularity and, if possible, by identifying the roles played by the individual defendants in the misrepresentations.

■ Ordinarily, outside directors are not involved in a corporation's day-to-day affairs. Thus, the group pleading doctrine may be invoked as to outside directors only if they: 1) participated in the day-to-day management of the part of the company involved in the alleged fraud, *Smith,* Fed.Sec.L.Rep. (CCH) ¶ 95,659 at 98,093, or; 2) had a special relationship with the corporation. *See In re Ross Systems Sec. Lit.,* Fed.Sec.L.Rep. (CCH) ¶ 98,363 at 90,496, 1994 WL 583114 (N.D.Cal.1994); *XOMA,* Fed.Sec.L.Rep. (CCH) ¶ 96,491 at 92,160–61 (N.D.Cal.1991).

■ Plaintiffs' allegations against Antle, Caufield and Harding are not adequately pled. There are no allegations in the SAC that any of the three participated in the day-to-day management of Quickturn. Rather, the SAC alleges that each of them "signed Quickturn's Prospectus, as well as its 1993 Report on Form 10–K filed with the SEC." SAC ¶ 23. However, an outside director does not become liable for the contents of a group published document merely by signing it. *Gupta,* Fed.Sec.L.Rep. (CCH) ¶ 98,612 at 91,782; *Ross Systems,* Fed.Sec.L.Rep. (CCH) ¶ 98,363 at 90,496. Thus, this allegation fails to state a claim against Antle, Caufield and Harding.

Plaintiffs also contend that the outside directors are liable because they drafted the documents containing the misleading statements. However, the SAC contains no such allegation against any of the outside directors. The only allegations Plaintiffs cite concerning the preparation of documents, SAC ¶ 128, are against Quickturn and the Underwriters.

■ Finally, Plaintiffs suggest that Caufield and Harding are liable because they are the sole members of Quickturn's audit committee. This argument is unpersuasive.

Mere membership on a corporate defendant's board of directors is insufficient to establish group published liability. *Gupta*, Fed.Sec. L.Rep. (CCH) ¶ 98,612 at 91,782; *Ross Systems*, Fed.Sec.L.Rep. (CCH) ¶ 98,363 at 90,-496.

Therefore, the Court concludes that Plaintiffs have not stated a claim against the outside directors.

## II. *THE UNDERWRITERS' MOTION TO DISMISS*

### A. *Section 10(b) Claims*

As discussed in section I., *supra*, the only allegations of fraud that Plaintiffs have pled with particularity are those relating to Quickturn's writeoff of $3.7 million in revenue for sales to Acri and Ball. Nowhere in the SAC do Plaintiffs allege that the Underwriters were aware of any impropriety in Quickturn's accounting practices with respect to Acri and Ball. Therefore, Plaintiffs' have not pled with particularity any facts showing that the Underwriters participated in any fraud. All § 10(b) claims against the Underwriters are DISMISSED.

### B. *Section 11 and 12(2) Claims*

As discussed in section I.B., *supra*, Plaintiffs lack standing to sue under §§ 11 and 12(2). Therefore, no claims against the Underwriters pursuant to these two sections are viable either.

## CONCLUSION

Based on the foregoing, the Quickturn Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART, and the Underwriters' motion to dismiss is GRANTED.

The following of Plaintiffs' claims are pled with particularity:

1) the accounting fraud allegations concerning the recognition and subsequent writeoff of $3.7 million in revenue for sales to Acri and Ball;

2) Quickturn's predictions of future results contained in press releases quoted at ¶¶ 57, 61, 66, 69, 77, 92 of the SAC, only as they may be contradicted by the alleged knowledge of the improper recognition of revenue for sales to Acri and Ball;

3) the statements in the analysts' reports quoted at ¶¶ 62, 64, 69, 70, 72, 73, 80, 81, 82, 83, 86, 87, 95 and 96 of the SAC for which Plaintiffs have adequately pled entanglement, only as they may be contradicted by Defendants' alleged knowledge of the improper recognition of revenue for sales to Acri and Ball.

All of Plaintiffs' other allegations, including all those against the Underwriters and the outside directors, are inadequate. Since Plaintiffs have already been allowed to amend their complaint twice, and they have not been able to do any better than speculative and conclusory accusations of fraud, these allegations are DISMISSED WITH PREJUDICE.

The stay of discovery that this Court imposed in its June 30, 1995 Order is lifted only with respect to Plaintiffs' claims regarding Acri and Ball, and how the alleged improper recognition of revenue for sales to those two customers may have undermined Quickturn's public statements.

IT IS SO ORDERED.